# ORIGINAL

FILED IN CLERK'S OFFICE
U S D C ...

DEC 1 3 2012

JAMES N. HATTEN, Clerk

By _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for ROCKBRIDGE COMMERCIAL BANK, <br><br> Plaintiff, <br><br> v. <br><br> LAUCH McKINNON, STEVEN LEHWALD, E.M. THORNE, III, CARL BURR, LAWRENCE SMITH, ARNOLD TILLMAN (nominally to the extent of insurance coverage only), and DAVID ZALIK, <br><br> Defendants. | ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] ] |

**TCB**

CIVIL ACTION FILE NO.:

**1 12·CV-4313**

JURY DEMANDED

---

## COMPLAINT

---

Federal Deposit Insurance Corporation ("FDIC"), as Receiver ("FDIC-R")

for Rockbridge Commercial Bank ("Rockbridge" or the "Bank"), hereby files its

Complaint against the Defendants, showing the Court as follows:

## I.    INTRODUCTION

1.    On December 18, 2009, the Georgia Department of Banking and

Finance ("GDBF") closed Rockbridge and appointed FDIC-R as receiver. At that

time, the FDIC- R succeeded to all the rights, titles, and privileges of Rockbridge and its stockholders, account holders, and depositors. 12 U.S.C. 1821(d)(2)(A)(i). Thereafter, the FDIC-R paid Rockbridge's depositors the value of their insured deposits, which totaled approximately $107.5 million. The FDIC-R, by operation of law, is now subrogated to all rights of the depositors. Pursuant to 12 U.S.C. § 1821(d)(11)(A), any recoveries that the FDIC-R makes, after administrative expenses, will be paid first to the depositors.

2.      FDIC-R asserts claims against three former Rockbridge officers (the "Officer Defendants"), to wit, Defendants Lauch McKinnon ("McKinnon"), Steven Lehwald ("Lehwald"), and E.M. Thorne, III ("Thorne"), and four former directors (the "Director Defendants"), to wit, Carl Burr ("Burr"), Lawrence Smith ("Smith"), Arnold Tillman ("Tillman"), and David Zalik ("Zalik") (collectively referred to as the "Defendants") for negligence, gross negligence, and breach of fiduciary duty in operating and managing the lending function of the Bank. The FDIC-R seeks compensatory damages and other relief as a result of Defendants' tortious conduct (the "Damages").

3.      Collectively, the Defendants were charged with, among other responsibilities, the responsibility of operating and managing the lending function of the Bank.  Rather than manage the Bank's lending function in a sound and

- 2 -

responsible manner, the Defendants took unreasonable risks with the Bank's loan portfolio, allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk and speculative acquisition, development and construction ("ADC"), commercial real estate ("CRE"), aviation, and business acquisition loans, loan participations, and lines of credit, disregarded regulator warnings regarding lending activities, violated the Bank's loan policies and procedures, and knowingly permitted poor underwriting in contravention of the Bank's policies and industry standards.

4.    Each of the Defendants also routinely and regularly recommended and/or affirmatively voted to approve loans, purchase participations and other extensions of credit without adequately informing themselves of the relevant risks in connection with the approval of loans, failed to prevent violations of Rockbridge's loan policies, and failed to prevent the approval of loans they knew or should have known would likely cause the Bank to suffer substantial damages.

5.    Among other problems, the Defendants approved the purchase of interests in a number of loans without Rockbridge having conducted its own independent due diligence and underwriting of the loans. Instead, the Defendants improperly approved these purchases based on at best outdated or inadequate underwriting by other institutions.

6.     As described in detail below, the Defendants' negligence and gross negligence in their numerous, repeated, and obvious breaches and violations of the Bank's Loan Policy and procedures, underwriting requirements, banking regulations, and prudent and sound banking practices are exemplified by 16 loans made between February 14, 2007, and November 12, 2008, which proximately caused Damages to the Bank of an amount to be proven at trial in excess of $27 million.

## II.    THE PARTIES

### A.     Plaintiff

7.     FDIC-R is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C. 12 U.S.C. § 1821(d).  As stated in paragraph 1, pursuant to 12 U.S.C. §§1821(c) and (d)(2)(A)(i), the FDIC-R is the successor to all the rights, titles, and privileges of Rockbridge and its stockholders, account holders, and depositors.

### B.     Officer Defendants

8.     McKinnon was Chairman of the Board, President, and Chief Executive Officer ("CEO") of Rockbridge from October 13, 2006 until he retired on August 20, 2009.  McKinnon was also a member of the Loan Committee

- 4 -

("LC") during the same period of time.

9.      Lehwald was Vice President ("VP") of Commercial Lending from January 9, 2007 until March 13, 2009. Although he was not a member of the LC, Lehwald approved several of the loss loans in his capacity as a loan officer and recommended a number of loans that resulted in losses to the Bank.

10.     Thorne was a Senior Vice President ("SVP"), Senior Lending Officer ("SLO"), and a member of the LC from October 13, 2006 until December 9, 2009.

## C.    Director Defendants

11.     Barr was a director and member of the LC from October 13, 2006 until the Bank closed.

12.     Smith was a director from October 13, 2006, and a member of the LC from October 23, 2006, until the Bank closed.

13.     Tillman was a director from October 13, 2006, and Chairman of the LC from October 23, 2006, until June 12, 2009.[1]

14.     Zalik was a director from October 13, 2006, and a member of the LC

---

[1] On November 1, 2010, Tillman filed Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia. Pursuant to the Bankruptcy Court's Order of December 10, 2012, FDIC-R is permitted to maintain this action against Tillman nominally and only to the extent of liability insurance. FDIC-R does not seek to recover from the personal assets of Tillman.

from October 23, 2006, until he resigned on September 3, 2009.

## III.   JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction over this case pursuant to: 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

16.   This Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and/or conducted the business of the Bank, in the State of Georgia.

17.   Venue is proper in this district under 28 U.S.C. § 1391(b), because a substantial portion of the events and/or omissions giving rise to the claims and damages asserted herein occurred in this district.

## IV.   FACTS

18.   Rockbridge was headquartered in Atlanta, Georgia, and opened for business on November 13, 2006, as a state non-member bank. Rockbridge was wholly owned by Rockbridge Financial Holdings, Inc., a one-bank holding company. Rockbridge operated a single branch, also located in Atlanta, Georgia.

### A.   The Bank's Lending Operations and Concentrations

19.   Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan

portfolio management. Loan underwriting standards define the bank's desired level of creditworthiness for individual loans and provide uniform criteria for evaluating loans with similar characteristics. Underwriting standards are also important in protecting the bank's capital which can erode from unsafe and unsound lending practices.

20.     Underwriting practices (which are described in Part 364 and 365 of the FDIC Rules and Regulations) can generally be characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.     Underwriting practices also encompass the management and administration of the portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies and adherence to written underwriting policies.

21.     The foremost means to control loan quality and a good loan portfolio are by the loan approval process. An effective loan approval process establishes minimum requirements for the information and analysis upon which a credit decision is based. The purpose of a loan approval process is to provide controls to ensure acceptable credit at origination.

22.     Risk diversification is a basic tenant of portfolio management. 12 C.F.R. § 30, "Standards for Safety and Soundness" (appendix B), requires banks to

accord adequate consideration to concentrations of credit risk in their underwriting practices.

23.    Rockbridge's original business plan called for a diverse portfolio mix of Commercial and Industrial ("C&I") loans, one-to four-family residential loans, ADC, CRE, and consumer loans funded by core deposits.  However, in order to leverage the capital from investors and grow the business faster than originally planned, shortly after Rockbridge opened, the Defendants caused the Bank to pursue an aggressive growth strategy that focused heavily on high-risk, and often out-of-territory, ADC, CRE, aviation, and other high-risk lending.  In doing so, Defendants substantially deviated from Rockbridge's original business plan without having the appropriate management expertise and internal controls in place to adequately mitigate the corresponding risks.

24.    As a result of this aggressive lending strategy, the Bank grew rapidly. From year end 2006 through September 30, 2009, ADC lending increased from $16,000,000 to $107,000,000, or 668.75%.  During this same period, other CRE lending increased from zero dollars to $73,000,000.  Combined ADC and CRE lending increased from $16,000,000 to $180,000,000, or 1,125%.

25.    From December 31, 2006, until December 31, 2007, the Bank's loans increased from $7,000,000 to $157,000,000, or 2,249%.  ADC and CRE loans in

2007 exceeded 340% of the Bank's Tier 1 capital.

26.    CRE and ADC loans are known to be more speculative than other types of loans because, among other reasons, of the lack of present cash flow sources, uncertainties of development and sale, and the need for adequate secondary sources of repayment. Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends impacting the industry and strict adherence to prudent lending policies and standards, all of which the Defendants failed to do.

27.    Moreover, in embarking on its plan to rapidly grow by ADC and CRE loans the Defendants effectively disregarded the recently issued joint guidance entitled Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices which reinforced existing regulations and guidelines for real estate lending and emphasized the importance of strong underwriting practices related to CRE and ADC loans.  It also pointed out that concentrations in CRE lending, coupled with weak underwriting and depressed CRE markets, contributed to significant credit losses in the past, a warning that Defendants failed to heed.

28.    In over concentrating the Bank's loan portfolio in CRE and ADC loans, the Defendants also effectively "turned a blind eye" to Rockbridge's Loan Policy and prudent underwriting standards which recognized the need to closely

monitor concentrations for adverse financial or economic conditions, stated that concentrations would be limited, and established guidelines for concentrations based on the perceived risk.

29.     Defendants knew or should have known that concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for numerous reasons, including: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations. In short, concentrations of CRE/ADC loans in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices. It is imperative that the known risks inherent in such high loan concentrations be managed by, at a minimum, management oversight, strategic planning, underwriting, risk assessment and monitoring of CRE/ADC loans, portfolio risk management, management information systems, market analysis, and stress testing.

30.     Exacerbating loan portfolio mismanagement and loan underwriting deficiencies, the Defendants continued to approve CRE and ADC loans between

2006 and 2008 in the face of deteriorating economic conditions.

31.    As Rockbridge's loan portfolio grew, the concentration of CRE and ADC loans to Total Capital increased the risk to the Bank and, as the quality of those loans deteriorated, Rockbridge's capital levels and earnings eroded.

32.    The Bank also became significantly involved in aircraft lending without employees with appropriate training and experience to properly underwrite and evaluate this type of specialty lending.    A substantial percentage of Rockbridge's aircraft loans resulted in losses as a result of poor underwriting standards and indicative of a lack of oversight by the Defendants to safeguard the Bank from losses.

33.    Between 2007 and 2009 the Defendants were repeatedly warned by regulators about, among other things: lack of adequate risk management controls, excessive level of purchased participations, over concentration of CRE/ADC loans, deficiencies in loan underwriting and credit administration, including but not limited to, violations of the Bank's legal lending limits, loans in excess of real estate loan-to-value ("LTV") limits, and regulatory violations. The Defendants failed to heed the regulators' warnings. Instead, Defendants effectively "doubled down" their bet on ADC, CRE and aircraft loans.

34.    By September 30, 2009, with capital declining, the Bank's ADC and

CRE loans exceeded 7,000% percent of its total capital. Roughly 12% of the Bank's loan portfolio consisted of aircraft loans. Exacerbating the problem caused by its heavy concentration in ADC and CRE loans and other risky lending propositions, 50% of Rockbridge's loans consisted of out-of-territory loans and participations, including loans in New York, Maine, Florida, Texas, and Alabama.

35.     Due to the deficient underwriting, risk management, and credit administration allowed by the Defendants in approving ADC and CRE loans, Rockbridge was fatally exposed to the inevitable cyclical decrease in real estate values. As real estate markets declined, the Bank's financial condition declined. This course of conduct, in addition to other imprudent, unsafe, and unsound practices perpetuated by the Defendants rendered the Bank insolvent. On December 18, 2009, GDBF closed the Bank and the FDIC-R was appointed Receiver.

### B.     Loan Underwriting and Violations

36.     Rockbridge had specific written policies and procedures governing the underwriting, acquisition and administration of loans (the "Loan Policy"). The Loan Policy was intended to ensure that the Bank pursued prudent banking practices and to limit the Bank's risk exposure. The relevant Loan Policy provisions include, but are not limited to:

1.    For all loans over $100,000, company financial statements prepared within 3 months and individual financial statements prepared within 12 months were required.

2.    The Bank's concentration of ADC loans was limited to 20% of its loan portfolio.

3.    Loan to value ("LTV") ratio limits were 85% for commercial and one- to four-residential and residential construction loans, 80% for commercial construction and aircraft loans, 75% for land development loans, and 65% for raw land loans.

4.    All loans over $250,000 required an independent appraisal prepared by a qualified appraiser.  The appraiser was required to provide an opinion of market value of an adequately described property as of a specific date supported by an analysis of relevant market information. The appraisal also was required to contain certain formal elements recognized by industry practices and to conform to the Uniform Standards of Professional Appraisal Practice ("USPAP").

5.    Loans to newly created entities were to be rated by the Bank's risk rating criteria no lower than "5" and quantified as "marginally acceptable."  These loans were to be placed on the watch list for at least one year.  ADC loans were to be rated no lower than "4" and quantified as "acceptable," as they were likely to be effected by economic cycles or changes in the business environment.

6.    Loans to newly formed entities were subject to greater underwriting requirements because it was considered highly likely that the success of the loans would be effected by economic cycles and changes in the business environment.  These loans required an action plan with specific actions and time tables to correct deficiencies when they arose and required review on a monthly basis by the LC and the Board of Directors.

7.    Interest reserves were to be used only to fund a reasonable stabilization period for income producing property.

8.    Aircraft loans were subject to underwriting guidelines, including

>       inspection and log book reviews, appraisals, review of financials and
>       tax returns of borrowers and guarantors prior to funding.

9.      Lines of credit were to be extended only to credit worthy local
        businesses for no more than 12 months.

10.     All loan participations were to be underwritten and documented as if
        Rockbridge had originated the loans, and the originating bank must
        maintain the largest ownership percentage.

Loan approval authorities, which were based on the total credit amount

outstanding to the borrower at the time of approval, were as follows:

1.      CEO: $1,000,000 secured and $100,000 unsecured.

2.      CLO: $500,000 secured and $100,000 unsecured.

3.      LC: $1,000,000 - legal lending limit.

37.     As detailed herein, the Bank suffered substantial damages from

significant departures from safe and sound banking practices by the Defendants.

Each of the Defendants repeatedly disregarded the Bank's Loan Policy and

approved loans and loan participations involving borrowers who were not

creditworthy and/or projects that provided insufficient collateral and guarantees for

repayment. Defendants repeatedly engaged in a pattern and practice of approving

loans and loan purchases without being reasonably well informed and in bad faith

that: 1) violated the Bank's Loan Policy, including, without limitation, the policy

provisions in paragraph 36 above; 2) evidenced systematic deficiencies in the

credit underwriting, approval, and administration process; and 3) violated sound

and prudent banking practices including, but not limited to, the general safety and soundness and underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

38.     Approvals of the following loans and loan participations illustrate, but are not exhaustive of, the types of failures, breaches, and violations of duty that each of the Defendants committed that damaged the Bank, and that constitute negligence, gross negligence, and breaches of fiduciary duty, either separately or together as a pattern or practice. (The loans and loan participations are described using initials of individuals for privacy reasons. The full names will be identified to the Defendants.)

39.     On or about June 11, 2008, Lehwald recommended, and Burr, McKinnon, Smith, Thorne, and Tillman approved, a loan in the amount of $3,200,000 to CLG Properties, LLC, a yet-to-be formed limited liability company. The purpose of the loan was to provide funds for the purchase of a 1978 Gulfstream aircraft to be used for charter services. The loan was initially approved in April 2008 to finance the purchase of a different aircraft, which the borrower was not able to purchase. The loan was increased by $50,000 and the aircraft collateral substituted without updated analysis of the particular aircraft to be purchased.     Approving this loan violated the Loan Policy, underwriting

requirements, and safe and sounds banking practices in at least the following respects: the loan was out of territory; there was no analysis or cash flow projections for the charter business from which the loan was to be repaid; there was inadequate analysis of the guarantor's financial stability and/or ability to service the loan, and information that was reviewed indicated a negative cash-flow history; and the guarantor did not provide audited financial statements as required by the loan policies. The negligent and grossly negligent approval of this loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

40.     On November 10, 2008, Lehwald approved an additional advance of $250,000 to CLG Properties, LLC. The purpose of this loan was to finance aircraft maintenance and upgrades being completed at the time the initial $3,200,000 loan to CLG Properties, LLC was approved. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to obtain approval by the LC; failure to obtain an appropriate appraisal; and other deficiencies as identified with respect to the initial loan to CLG Properties, LLC. The negligent and grossly negligent approval of this loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

41.    On or about May 16, 2007, Lehwald recommended, and Burr, McKinnon, Smith, Thorne, Tillman, and Zalik approved, a $4,250,000 loan to Fisherman's Cove of Southeast of Volusia Co., LLC.  The purpose of the loan was to finance the purchase a partially completed real estate project located in Volusia, Florida.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:  failure to obtain financial statements and perform sound financial analysis of the borrower; failure to obtain complete financial information and to perform sound financial analysis of the guarantors, including failure to obtain current financial statements and to account for contingent liabilities; failure to secure a sound source of repayment and to properly consider deteriorations in the real estate market; failure to obtain an appraisal before approval of the loan; LTV ratio violations; and LTC ratio violations.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

42.    On or about July 25, 2007, Lehwald recommended, and Burr, McKinnon, Smith, Thorne, and Tillman voted to approve the purchase of a $3,100,000 participation interest in a $5,000,000 ADC loan to J&E Developers, Inc.  The purpose of the loan was to finance the acquisition and development of

- 17 -

119 acres of residential real estate in Hamilton County, Tennessee. Rockbridge's participation interested amounted to 62% of the loan value, with the remaining balance funded by Gateway Bank & Trust of Ringold, GA. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: the Bank relied upon underwriting conducted by Gateway Bank and Trust without any independent underwriting of its own; violation of the Bank's LTV and LTC ratio requirements by funding a loan at 90% of cost, failure to perform sound financial analysis of the guarantors, including failure to review tax returns or perform cash flow analysis of the guarantors, failure to review financial information of the borrower, violation of the Loan Policy restrictions on loan participation interests and violations of the Loan Policy limitations on maturity dates, which restricted loans of this type to 12-month maturity dates. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

43.     On or about September 21, 2008, Thorne and McKinnon approved a $1,000,000 line of credit to JOA Alpha, LLC. The line of credit was to be used for general corporate expenses of the borrower's business operations, and particularly to provide bridge financing for the buy-out of certain business partners. Thorne

and McKinnon approved this loan under their officer approval authority and later reported it to the LC.  Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:  failure to obtain financial statements and tax returns for the borrower at the time the loan was approved; failure to obtain complete financial information and to perform adequate financial analysis of the guarantor, including failure to obtain background information related to information on the guarantor's financial statements, and to obtain financial statements or tax returns for 2005, 2006, 2007, and 2008 year-to-date; and failure to adequately evaluate the liquidity of the collateral (a Smith Barney hedge fund) as a potential source of repayment.  The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

44.    On or about December 5, 2007, Lehwald recommended, and Burr, McKinnon, Smith, Thorne, Tillman, and Zalik approved a loan to Kaizen Aviation, LLC.  The loan file contains two loan requests, both dated December 4, 2007, one for $4,500,000 and one for $4,600,000.  Although the Defendants named above only approved the request for $4,500,000, the loan was funded in the amount of $4,600,000.  The purpose of the loan was to refinance existing indebtedness on a Gulfstream aircraft, as well as to finance new paint and all costs associated with

- 19 -

the loan closing.   Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:   failure to obtain pro forma financial information from the borrower concerning the revenue to be expected from the proposed leasing of the aircraft and to perform adequate financial analysis of the borrower; failure to obtain adequate financial information of the guarantor and to perform adequate financial analysis of the guarantor's cash flow, liquidity, and ability to repay the loan; failure to obtain a current appraisal; and failure to require allocation of funds for intended maintenance and upgrades used to justify the appraised value.   The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

45.   On or about January 25, 2008, Lehwald approved a request to increase the amount of the existing Kaizen Aviation, LLC loan from $4,600,000 to $4,800,000.   The purpose of this loan was to finance equipment and maintenance related to the borrower's Gulfstream aircraft.   To support his approval of this loan, Lehwald relied upon the same credit memo and underwriting information related to the initial loan to Kaizen Aviation.   Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:   failure to obtain LC approval for all aggregate loans in excess

of $1,000,000, failure to obtain pro forma financial information from the borrower concerning the revenue to be expected from the proposed leasing of the aircraft and to perform adequate financial analysis of the borrower; failure to obtain adequate financial information of the guarantor and to perform adequate financial analysis of the guarantor's cash flow, liquidity, and ability to repay the loan; failure to obtain a current appraisal; and failure to require allocation of funds for intended maintenance and upgrades used to justify the appraised value. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

46.    On or about May 14, 2008, Burr, McKinnon, Smith, Thorne, Tillman, and Lehwald approved a modification of the existing Kaizen Aviation Loan from $4,800,000 to $5,300,000.   The loan was approved on this date after being presented for discussion purposes only and prior to any written loan request, which was not made until May 19, 2008. The purpose of the modification was to finance the purchase of a two-thirds interest in the borrower by third party individuals. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:  failure to obtain current financial statements and tax returns of the borrower which were necessary to perform proper financial analysis of the borrower; Failure to review written

documentation prior to approval of the loan; failure to ensure adequate repayment sources, including failure to review financial history or projections related to income to be generated from leasing of the subject aircraft; failure to obtain and review adequate financial information of the guarantors prior to approval of the loan; and failure to obtain adequate appraisal supported by detailed information related to the collateral. In addition, after the loan was approved by the LC for $5,300,000, Lehwald increased the loan to $5,400,000 to offset an increase in the buy-out amount. This increase, which occurred without approval of the LC as required for aggregate credits in excess of $1,000,000, was an additional violation of the Loan Policy. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

47. On or about March 5, 2008, Burr, Thorne, and Tillman approved a loan to R.M. and T.M. in the amount of $1,365,000. The purpose of the loan was to refinance an existing Regions Bank loan on residential beachfront property in Gulf Shores, Alabama. The borrowers held the property for investment property and they intended to build a home on the property for speculative resale. Approving this loan violated the Loan Policy, underwriting requirements and safe and sound banking practices in at least the following respects: insufficient debt

coverage ratio of the borrowers; insufficient liquidity of the co-borrower T.M.; violation of the Bank's LTV ratio limits for property of this type; violations of the 6-month restriction on maturity dates for loans of this type (the maturity for this loan was 24 months); and failure to ensure adequate sources of repayment, including failure to account for the fact that a significant portion of co-borrower R.M.'s net worth consisted of retirement assets which were not subject to collection efforts.    The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

48.    On or about November 19, 2007, McKinnon, Thorne, and Tillman approved a $4,320,000 loan to Oakbrook Ranches, LLC.[2]  The purpose of the loan was to refinance and consolidate six ADC loans related to a 19.82 acre proposed residential development in Broward County, Florida.   This loan was previously considered by the LC on November 14, 2007 but was tabled after members of the LC raised questions regarding the viability of the real estate deal.   For instance, Smith indicated he would be inclined to vote against the loan because it was out-of-territory, the guarantor had limited ability to "carry the project" and the

---

[2] Burr and Smith voted against the loan.

suggested price of $2,000,000 per lot for the proposed lots limited the pool of potential buyers. Burr raised similar concerns. Nevertheless, the Defendants named above approved the loan, which by a verbal agreement was intended to be sold to Broward County Bank of Commerce, a to-be-formed bank of which Tillman was a founder/organizer and to be the chairman of its board. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to perform adequate due diligence of the borrower; reliance upon guarantors who were acknowledged to be individually unable to support the loan; failure to account for the risk associated with the out of territory loan and economic market conditions related to residential real estate projects of this kind; failure to obtain an adequate appraisal; failure to ensure adequate sources of repayment; violation of the 65% restriction of LTV ratios for vacant land loans; failure to follow Loan Policy requirements related to documentation with respect to intended use of disbursements; and failure to obtain a written loan purchase agreement with Broward County Bank of Commerce, which ultimately did not purchase the loan. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

49.    On or about September 14, 2007, Burr, McKinnon, Smith, Thorne,

and Tillman approved the purchase of a $3,000,000 participation interest in a $14,900,000 ADC loan to PHV Duluth, LLC.  The purpose of the participation loan from Rockbridge was to cover interest and soft costs associated with continuing and highly speculative efforts to have commercial real estate in Duluth, Georgia re-zoned to allow for a high density, mixed use development.  Approving this loan participation violated the Loan Policy, underwriting requirements and safe and sound banking practices in at least the following respects:  failure to ensure that the loan was underwritten to the standards required by the Loan Policy; violation of the Bank's 65% restriction on LTV/LTC ratios for land acquisition loans (the LTV ratio for this loan was 142%); failure to perform a feasibility analysis concerning the proposed re-zoning of the property or to account for the impact on loan repayment in the event re-zoning did not occur; failure to account for the borrower's lack of large-scale development experience; and failure to perform an adequate analysis of the guarantor's financial condition, which would have shown limited liquidity or cash flow to repay the loan.  In October 2008, after re-zoning efforts had been unsuccessful, the borrower indicated its inability to sell the property, and the guarantor indicated that he was personally unable to service the debt, the Bank agreed to extend the loan to facilitate the hope of a sale, which never occurred.  The negligent and grossly negligent approval of the loan resulted

in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

50.    On or about May 11, 2007, Burr, McKinnon, Smith, Thorne, Tillman, and Zalik approved the purchase of a $2,150,000 participation interest in a $14,250,000 ADC loan to Pinnacle Properties, LLC, a newly formed, single asset entity. The purpose of the loan was to finance the acquisition and development of approximately 27 acres of commercial real estate in the suburbs of Atlanta, Georgia. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: violation of the Bank's 75% LTV ratio restriction for loans of this type (actual LTV ratio was approximately 100%); violation of Loan Policy restrictions on maturity dates for loans of this type (the limit was 12 months but this loan was for 24 months); failure to obtain a market study confirming the feasibility of the borrower's development plan as required by the Loan Policy; failure to obtain an adequate appraisal that valued the collateral in the manner required by the Loan Policy; failure to perform sufficient financial analysis of the guarantors, including failure to account for the fact that the individual guarantor's financial statements reflected assets jointly owned with his wife (who was not a guarantor) and significant contingent liabilities (which were not analyzed to determine their potential impact on the guarantor's ability to support the debt), failure to conduct

- 26 -

any detailed analysis of the corporate guarantor (an entity owned by the individual guarantor); and failure to perform any cash flow analysis of the guarantors. The negligent and grossly negligent approval of the loan participation resulted in substantial damages to the Bank and the FDIC-R in an amount to be proved at trial.

51.     On or about April 23, 2007, Lehwald recommended, and Burr, McKinnon, Thorne, Tillman, and Zalik approved, a $1,500,000 unsecured line of credit to an individual, J. R. The purpose of the line of credit was to provide short-term bridge financing for acquisition of real estate. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to obtain collateral to secure the loan; violation of the Bank's LTV ratio restrictions on lines of credit; failure to obtain appropriate collateral; failure to verify an appropriate source of repayment; and failure to perform an adequate financial analysis of the borrower, including failure to adequately account for the borrower's negative scores on ratios commonly used for evaluating unsecured loans to high net worth individuals. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

52.     On or about December 19, 2007, Burr, McKinnon, Smith, Thorne, Tillman, and Zalik approved a loan in the amount of $5,900,000 to Skyview

Aviation, Inc. The purpose of the loan was to finance the purchase of a Gulfstream aircraft to be used by the borrower in an aircraft leasing business. Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: failure to perform adequate financial analysis of the borrower, including failure to analyze any financial data other than debt service coverage; violation of Loan Policy requirements concerning analysis, business and cash flow projections for newly-formed entities (none of which were obtained); violation of the Loan Policy's one year restriction on maturity dates for loans given to newly-formed businesses (this loan was for 5 years); violation of the 80% LTV ratio restriction for aircraft loans; failure to perform adequate financial analysis of the guarantors; and failure to require approximately $1,000,000 worth of collateral improvements as contemplated by the appraisal.

53.    On or about July 2, 2007, Burr, McKinnon, Thorne, and Tillman voted to approve the purchase of a $2,000,000 participation interest in a $6,500,000 loan to Trios Travel, LLC, which was originated by Alpha Bank of Alpharetta, Georgia.[3]   Trios Travel, LLC was a newly-formed entity, and the

---

[3] Smith voted against the loan.

purpose of the loan was to provide financing for the purchase of an internet hotel consolidator known as TravelWorm. Rockbridge's participation interest amounted to 31% of the total loan advanced to the borrower. Approving this loan participation violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects: Rockbridge performed no independent underwriting of its own but instead relied heavily upon documentation assembled by Alpha Bank; failure to follow Loan Policy requirements that the lead lender, Alpha Bank, maintain the largest ownership interest in the loan (Alpha Bank retained no ownership interest); failure to ensure adequate sources of repayment (TravelWorm never made a profit and had significant cash flow issues); failure to perform adequate financial analysis of the guarantor, including failure to account for the fact that the guarantor had significant contingent liabilities amounting to more than 300% of his net worth, tax liens, and a majority of his liquid assets were set off by Bank of America due to a default on a loan he guaranteed; LTV ratio violations for loans of this type; and failure to document a repurchase agreement with Alpha Bank (which went into receivership before Rockbridge and never repurchased the loan or any percentage of it. The negligent and grossly negligent approval of the loan resulted in substantial damages to the Bank and FDIC-R in an amount to be proved at trial.

54.     On or about February 14, 2007, Lehwald recommended, and Burr, McKinnon, Smith, Thorne, Tillman, and Zalik approved, a loan in the amount of $3,035,000 to Texas Grand Market, Inc.  The purposes of the loan were to refinance existing debt of $1,700,000 owed to Integrity Bank in connection with a real estate investment, buy-out a minority partner in the investment for $775,000, provide an interest carry of $480,000, and cover $80,000 of transaction costs of the loan refinance.  Although the property was purchased less than two years before the loan, the loan was based upon an appraised value that was 300% of the purchase price.  There was no evidence that the borrower had any equity in the property, and the interest carry ensured that the borrower would not have to fund the loan during its term.     Approving this loan violated the Loan Policy, underwriting requirements, and safe and sound banking practices in at least the following respects:  failure to ensure adequate sources of repayment, including failure to account for local real estate market conditions; failure to obtain an appropriate appraisal; violations of the LTV and LTC restrictions in the Loan Policy (this loan exceeded 100% of actual cost); failure to perform a sound financial analysis of the guarantor, including reliance upon a stale credit report and failure to obtain information necessary to evaluate contingent liabilities; failure to perform a sound financial analysis of the borrower and violation of the Loan

Policy's 12-month restriction on maturity date for land acquisition loans (this loan was for 18 months with a 6 month option). The negligent and grossly negligent approval of the loan resulted in substantial damages to the bank and FDIC-R in an amount to be proved at trial.

55.     Based upon the Defendants' negligent and grossly negligent conduct in connection with the foregoing transactions, the FDIC-R has been harmed. With respect to each Defendant, as a result of that Defendants' negligence, gross negligence, and breaches of fiduciary duty (all as outlined below), the FDIC-R seeks damages in at least the following amounts:   McKinnon - $26,167,620, Lehwald - $14,978,316, Thorne - $26,257,938, Burr - $22,979,058, Smith - $18,495,832, Tillman - $26,257,938, and Zalik - $14,915,070.

## V.     CAUSES OF ACTION

## COUNT I

## ORDINARY NEGLIGENCE UNDER GEORGIA LAW

56.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 55 above as if fully set out in this count.

57.     Each of the Defendants owed Rockbridge a duty of care under common law, O.C.G.A. §§ 7-1-490, 51-1-2, and other facets of Georgia law, to exercise the diligence, care, and skill that ordinarily prudent persons would

exercise under similar circumstances in like position. Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable rules and regulations of the Bank. The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

58.     Defendants are not entitled to the application of the business judgment rule, because none of the Defendants' actions or inactions which are the basis of this negligence claim were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants ignored regulator's warnings regarding loan underwriting and risk management deficiencies, repeatedly approved loans in violation of the Loan Policy and Parts 364 and 365 of the FDIC's Rules and Regulations, and by exposing the Bank to undue risk by over concentrating in CRE/ADC loans, purchasing participations, and engaging in other high-risk lending practices without adequate risk management controls, despite regulator warnings related thereto.

59. Defendant McKinnon, as President, CEO, and Chairman of the Board, among other duties, was responsible for the overall management of the Bank including, but not limited to, all facets of the Bank's lending, and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending function. These duties included, but were not limited to, ensuring: that the Bank had adequate policies, procedures and internal controls relating to, among other things, ADC/CRE and aircraft lending; that the Bank adhered to its business plan, lending and credit policies, loan approval process and loan and credit administration practice; that the Bank complied with banking statutes/regulations; that the Bank did not make imprudent loans and extensions of credit as part of a plan to unreasonably grow the Bank; and that the Bank approved loans and purchased participations that complied with the Bank's Loan Policy and prudent and sound lending practices. He was also responsible for supervising various officers, including but not limited to, Defendants Lehwald and Thorne.

60. Defendant Thorne, as SVP, SLO, and member of the LC, among other duties, reported to Defendant McKinnon and was responsible for the Bank's lending function, including its ADC/CRE and aviation lending, and had the

- 33 -

obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending activities. These duties included, but were not limited to, ensuring: that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, ADC/CRE and aviation lending and loan participation purchases and sales; that the Bank adhered to its policies, procedures and controls, and; that the Bank complied with banking statutes/regulations and prudent and sound lending practices.

61.     Defendant Lehwald, as VP of Commercial Lending, among other duties, reported to Defendant McKinnon and was responsible for ADC/CRE lending and had the obligation to exercise a degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight and conduct of the Bank's lending activities. These duties included, but were not limited to, ensuring: that the Bank had adequate loan policies, procedures and internal controls relating to, among other things, ADC/CRE lending and loan participation purchases and sales; that the Bank adhered to its policies, procedures and controls, and; that the Bank complied with banking statutes/regulations and prudent and sound lending practices.

62.     By their actions and inactions, as described specifically and generally

- 34 -

herein, Defendants McKinnon, Thorne, and Lehwald, as officers of the Bank, repeatedly failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a.   As to Defendant McKinnon, his negligence and grossly negligent acts included, without limitation:

(i)   Failing to ensure that the Bank's lending and loan participations complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)   Failing to monitor and supervise subordinate officers and employees of the Bank with respect to the Bank's lending;

(iii)   Disregarding and failing to take appropriate steps to address criticisms and warnings by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(iv)   Failing to ensure that loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(v)   Recklessly permitting the pursuit of a high-risk stratagem

on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(vi)   Failing to implement and follow sound underwriting and credit administration practices;

(vii)   Failing to implement prudent risk management strategies;

(viii) Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards;

(ix)   Failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise in such lending practices;

(x)   Failing to ensure that Bank management followed the Loan Policy, and;

(xi)   Failing to properly supervise, manage, and oversee the Bank's loan operations.

b.   As to Defendant Thorne, his negligent and grossly negligent acts included, without limitation:

(i)   Failing to ensure that the Bank's lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)  Disregarding and failing to take appropriate steps to address criticisms and warnings by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(iii)  Failing to ensure that loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(iv)  Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(v)  Failing to implement and follow sound loan underwriting and credit administration practices;

(vi)  Failing to implement prudent risk management strategies;

(vii)  Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy;

(viii) Failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise in such lending practices;

(ix)  Failing to properly supervise, manage, and oversee the Bank's loan operations, and;

(x)     Approving and/or recommending for approval loans and loan participations that were in violation of the Bank's Loan Policy and/or that had not been properly underwritten.

c.     As to Defendant Lehwald, his negligent and grossly negligent acts included, without limitation:

(i)     Failing to ensure that the Bank's lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

(ii)     Disregarding and failing to take appropriate steps to address criticisms and warnings by regulators with respect to the Bank's ADC/CRE lending and loan participations;

(iii)     Failing to ensure that loans made by the Bank were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

(iv)     Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

(v)     Failing to implement and follow sound loan underwriting and credit administration practices;

(vi) Failing to implement prudent risk management strategies;

(vii) Failing to follow the Bank's Loan Policy and failing to ensure that Bank management followed the Loan Policy;

(viii) Failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise with such lending practices;

(ix) Failing to properly supervise, manage, and oversee the Bank's loan operations, and;

(x) Approving and/or recommending for approval loans and loan participations that were in violation of the Bank's Loan Policy and/or that had not been properly underwritten..

63. In addition to the duties set forth above, Director Defendants had the duty under Georgia law to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting and credit administration practices were followed and to take reasonably prudent steps to ensure that the Bank did not make imprudent loans or extensions of credit as part of a plan to unreasonably grow the Bank, and to exercise ordinary care and diligence in the administration of the affairs of the Bank, including, but not limited to, the following:

     a. Informing themselves about proposed loans and loan

- 39 -

participations and the risks posed to the Bank before they approved them;

  b. Exercising independent judgment in connection with the review and approval or disapproval of loans and loan participations;

  c. Confirming that any loans they approved were underwritten in a safe and sound manner;

  d. Ensuring that any loans they approved were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or minimize the risk of loss to the Bank;

  e. Not approving loans that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss, and;

  f. Ensuring that any loans approved did not violate applicable banking regulations.

  64. By their common actions and inactions, as described specifically and generally herein, Defendants Barr, Smith, Tillman, and Zalik, as directors of the Bank and members of the LC, collectively failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their statutory and common law duties of care, as follows:

a. Failing to ensure that the Bank's lending complied with the Bank's policies and procedures, banking statutes and regulations, and prudent and sound lending practices;

b. Failing to monitor and supervise the officers and employees of the Bank with respect to ADC/CRE and aviation lending;

c. Disregarding and failing to take appropriate steps to address warnings and criticisms by regulators with respect to the Bank's ADC/CRE lending.

d. Failing to inform themselves about the risks that the credit transactions posed to the Bank before they approved them;

e. Failing to exercise independent judgment in connection with the review and approval or disapproval of credit transactions;

f. Failing to ensure that the loans approved and/or ratified by the LC were safe, sound, and reasonable, and that the Bank had a reasonable prospect of being repaid by the debtors;

g. Failing to confirm that the extensions of credit were underwritten in a safe and sound manner;

h. Failing to ensure that the credit transactions were secured by sufficiently valuable collateral and had sufficient repayment sources to prevent or

- 41 -

minimize the risk of loss to the Bank;

      i.     Approving credit transactions that caused the Bank to exceed the Bank's relevant concentration limits;

      j.     Recklessly permitting the pursuit of a high-risk stratagem on an over concentration of speculative, high risk, and poorly underwritten ADC/CRE loans;

      k.     Failing to implement and require bank officers to follow sound loan underwriting and credit administration practices;

      l.     Failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise in such lending practices;

      m.     Failing to implement and monitor prudent risk management strategies;

      n.     Allowing officers of the Bank repeatedly to violate the Bank's Loan Policy, and approving and/or ratifying loans that were in material violation of the Bank's Loan Policy, and;

      o.     Approving loans and loan participations which violated the Bank's Loan Policy and sound and prudent underwriting standards.

      65.     With regard to each Director Defendant, the general acts of

negligence and gross negligence applicable to each Director Defendant are set forth in paragraphs 23 to 35. In addition, specific deficiencies and violations relating to the approval of illustrative loans which are applicable to each Defendant and identified within paragraphs 37 to 55.

66.     As a direct and proximate result of the Defendants' negligence, the FDIC-R suffered compensatory damages in an amount to be proven at trial.

67.     With respect to their negligent actions and inactions, Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(k)

68.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 55 above as if fully set out in this count.

69.     Section 1812(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC-R receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. Georgia law defines "gross negligence" as the absence of that degree of

care which every man of common sense, however inattentive he may be, exercises under the same or similar circumstances.

70.    In the alternative, the acts or omissions of each of the Defendants, as described particularly in   paragraphs 37 to 55 of this Complaint for repeatedly approving ADC, CRE and aircraft loans which each Defendant knew violated the Loan Policy and sound and prudent underwriting in their desire to grow the Bank, and especially for Damages occurring after the Defendants were warned by regulators of over concentration of ADC and CRE loans and deficiencies in loan underwriting and credit administration as set forth in paragraph 33, and after they knew or should have known of deterioration of the housing market, which warnings were effectively ignored, demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

71.    Each of the Defendants acted with gross negligence in operating the lending function of the Bank as follows:

a.    Defendant McKinnon, by, among other things: carelessly failing to require compliance with the Bank's Loan Policy; disregarding regulators' warnings and criticisms regarding loan underwriting, risk management and loan

concentrations; repeatedly failing to ensure that loans and loan participations were underwritten in a safe and sound manner; approving loan, credit extension transactions and loan participations that failed to comply with the Bank's policy and safe and sound lending practices; failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise with such lending practices; and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans in order to rapidly grow the Bank without adequate risk management controls. These actions and inactions, individually and/or cumulatively, by Defendant McKinnon demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

   b. Defendant Thorne, by, among other things: carelessly failing to comply with the Bank's Loan Policy; disregarding regulators' warnings and criticisms regarding loan underwriting, risk management and loan concentrations; repeatedly failing to ensure that loans and loan participations were underwritten in a safe and sound manner; originating and recommending for approval loan and credit extension transactions that failed to comply with the Bank's policy and safe and sound lending practices; failing to ensure that the Bank's aircraft lending was

underwritten by individuals with appropriate skill, experience and expertise with such lending practices; and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans. These actions and inactions, individually and/or cumulatively, by Defendant Thorne demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

        c.    Each Director Defendant as a member of the LC, by and among other things, engaged in a common pattern and practice of: failing to conduct proper due diligence and to be reasonably well informed prior to approving loans and loan participations; failing to comply with the Bank's Loan Policy; disregarding regulators' warnings and criticisms; failing to ensure that loans and loan participations were underwritten in a safe and sound manner; failing to ensure that the Bank's aircraft lending was underwritten by individuals with appropriate skill, experience and expertise with such lending practices; and allowing the Bank's loan portfolio to be over concentrated in speculative ADC/CRE loans. These actions and inactions, individually and/or cumulatively, by each Director Defendant demonstrate the failure to exercise that degree of care that every person of common sense, however inattentive that person may be, exercises under the

same or similar circumstances, or lack of the diligence that even careless persons are accustomed to exercise.

72.   As a direct and proximate result of the Defendants' gross negligence, the FDIC-R has suffered Damages in an amount to be proven at trial.

73.   With respect to their grossly negligent actions and inactions, the Defendants pursued a common plan or design, or otherwise acted in a common or concerted manner, and therefore, each Defendant is jointly and severally liable for all damages.

## COUNT III

## BREACH OF FIDUCIARY DUTY

74.   FDIC incorporates by reference each of the allegations in paragraph 1 through 55 of this complaint.

75.   Each of the Defendants, as officers and/or directors of the Bank, served in a fiduciary capacity and owed the Bank fiduciary duties to exercise the highest degree of care, as well as complete loyalty, honesty and good faith in the management, supervision and conduct of the Bank's business and financial affairs.

76.   By their actions and inactions, as specifically described in paragraphs 23 to 35 and 37 to 55, each of the Defendants  abused their discretion and/or acted in bad faith in the performance of their respective duties as officers and/or directors

of the Bank, constituting breaches of their fiduciary duties owed to the Bank.

77.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, the Bank and FDIC-R suffered substantial Damages in an amount to be proved at trial.

78.    With respect to their actions and inactions in managing the affairs of the Bank, Defendants pursued a common plan or design and, therefore, each Defendant is jointly and severally liable for all losses.

## VI.    REQUEST FOR RELIEF

79.    Pursuant to Federal Rule of Civil Procedure 38, the FDIC-R demands a trial by jury on all claims.

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Rockbridge Commercial Bank, requests entry of judgment in its favor against Defendants as follows:

1.    For compensatory damages, jointly and severally, of at least $27,617,000.00, and any excess amount as may be proved at trial;

1.    For its costs of suit against all Defendants;

2.    For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(1), and;

3.    Such other and further relief as the Court deems just and proper.

This 13th day of December, 2012.

MILLER & MARTIN PLLC

By: _____

Charles B. Lee
Georgia Bar No. 443095
Michael P. Kohler
Georgia Bar No. 427727
Laura Ashby
Georgia Bar No. 595907

1170 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309-7706
Telephone: (404) 962-6100
Facsimile: (404) 962-6300
Email:  clee@millermartin.com
        mkohler@millermartin.com
        lashby@millermartin.com

- and –

Robert E. Craddock, Jr. (TN Bar # 5826)
Douglas A. Black (TN Bar # 11412)
WYATT TARRANT & COMBS, LLP
1715 Aaron Brenner Drive, Suite 800
Memphis, TN 38120
Telephone: (901) 537-1000
Facsimile:  (901) 537-1010
Email:  rcraddock@wyattfirm.com
        dblack@wyattfirm.com

***Attorneys for Federal Deposit Insurance Corporation, as Receiver of Rockbridge Commercial Bank***

- 49 -